## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

            Plaintiff,

    vs.

TWILA JO DAVIS,

            Defendant.

1-05-cr-00004-JWS-JDR

**RECOMMENDATION REGARDING MOTION TO VACATE (§ 2255)**

(Docket No. 314)

Defendant Twila Jo Davis filed an amended § 2255 petition alleging ineffective assistance of trial counsel in violation of her Sixth Amendment rights under the U.S. Constitution. Doc. 314. The United States filed an answer in opposition to the motion at document 319. On November 13, 2007, an evidentiary hearing on the motion to vacate was convened before the magistrate judge. Testimony was adduced from defendant Davis and her trial attorney, Scott Sterling. At the request of defense counsel, oral argument on the motion was heard on December 3, 2007. Upon due consideration of the arguments and evidence, the magistrate judge recommends that the motion to vacate be denied for reasons set forth below.

## Findings of Fact

### A.    Plea Agreement

On October 15, 2005, defendant Twila Jo Davis signed a 27-page Plea Agreement with the government.[1]  The Agreement was signed by Twila Jo Davis, her attorney Scott Sterling, and James Goeke and Timothy M. Burgess for the government.  The Plea Agreement contains language relevant to the motion to vacate as follows:  Davis agreed to plead guilty to Count 2 charging attempted possession with intent to distribute 50-grams or more of a mixture or substance containing a detectible amount of methamphetamine in violation of 21 U.S.C. § § 846, 841(a)(1)(b)(1)(B).[2]  The Agreement was entered into pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B) meaning that Davis "may not withdraw from this agreement if the court deviates from the sentencing recommendations made by the United States or by defense counsel.  Neither the defendant nor the Court is bound by the government's sentencing estimates.[3]  The Sentencing Commission Guidelines (U.S.S.G.) were advisory only.  The Plea Agreement recited that the Plea Agreement was a negotiated resolution of the case.

---

[1] A copy of the Plea Agreement is Exhibit A.

[2] Plea Agreement, p.2.

[3] Plea Agreement, p.2.

Pursuant to the written Plea Agreement the United States agreed to dismiss Count 1 of the Indictment, charging conspiracy to distribute and possess with intent to distribute 50 grams, or more, of methamphetamine and 500 grams or more of a mixture or substance containing a detectible amount of methamphetamine, in violation of Title 21 U.S.C. § § 841(a)(1) and 841 (b)(1)(A). "Unless specifically set forth in his Plea Agreement, the defendant agrees she will not seek any downward departures under the U.S.S.G. or any other authority."[4]  The agreement specifically does not prohibit Davis from arguing any downward Guideline adjustments.

In the Plea Agreement Davis waived her right to appeal her conviction. The only exceptions to a collateral attack waiver were a challenge alleging ineffective assistance of counsel - "based on information not now known to the defendant and which, in the exercise of reasonable diligence, could not be known by the time the court imposes sentence" . . . and a challenge to the voluntariness of her guilty plea.[5]

"The defendant explicitly acknowledges that her plea to the charged offense authorizes the Court to impose any sentence up to and including the statutory maximum sentence, that is authorized by the Sentencing Guidelines. . . . The defendant understands a government motion for a substantial assistance

---

[4] Plea Agreement, p.4

[5] Plea Agreement, pp. 5-6.

departure is not a reward for cooperating with the United States. . . . The defendant understands there is a possibility that despite her agreement to cooperate, the United States may not file a motion for a substantial assistance departure on the defendant's behalf. . . . The defendant understands the decision to file a motion for a substantial assistance departure lie solely within the prosecutorial discretion of the United States.  . . . If the United States does not move for a substantial assistance departure the defendant agrees she will not be permitted to withdraw her plea of guilty.  The defendant also understands that she cannot challenge the government's decision to decline filing a motion for a substantial assistance downward departure, unless she can show that the government's decision was based on an unconstitutional motive or was done in bad faith.  Accordingly, the defendant acknowledges the United States has not guaranteed the defendant a motion for a substantial assistance downward departure . . . nor has it guaranteed the Court would grant such a motion if the United States moved for a substantial assistance departure."[6]

The Plea Agreement defined the meaning of substantial assistance.[7] "The defendant understands that if the United States moves for a substantial assistance departure under U.S.S.G § 5K1.1, 18 U.S.C. § 3553(e), or Federal Rule

---

[6] Plea Agreement, pp. 7-10.

[7] Plea Agreement, p.11.

of Criminal Procedure 5(b), the United States has not promised to make any particular sentence departure recommendation to the Court on her behalf.  . . . The defendant understands that even if the United States moves for a substantial assistance departure, . . . the Court is not bound to grant the motion.  The defendant understands and agrees that, if the United States moves for a substantial assistance downward departure, she will not be permitted to withdraw her plea if the Court finds that a downward departure is not appropriate or does not follow the departure recommendations made by either the government or the defendant."[8]

Section IV of the Plea Agreement set forth the maximum statutory penalties for Count 2 as "a mandatory minimum of five (5) years in prison and a maximum of forty (40) years in prison . . . . "  The Plea Agreement provided a non-binding guideline calculation estimated sentencing range of a 108 to 135 months.[9] And a non-binding guideline calculation the Plea Agreement repeated the mandatory minimum sentence of imprisonment "per 21 U.S.C. § 841(b)(1)(B) . . . five years."[10]

With respect to adjustments to the base offense level regarding Count 2 the Plea Agreement in bold stated: "specifically, the defendant understands that based  on her criminal history, she may qualify as a career offender pursuant to

_____

[8] Plea Agreement, pp. 12-13.

[9] United States v. Booker, 543 U.S. 220 (2005) created an advisory guidelines scheme for federal sentencing.

[10] Plea Agreement, pp. 16-17.

U.S.S.G. § 4B1.1.  If the defendant qualifies as a career offender pursuant to U.S.S.G. § 4B1.1, her criminal history category would be VI and her offense level would be 34.  After adjustment for acceptance of responsibility, the defendant would then face a sentencing range of 188 to 235 months."  The Plea Agreement specifically did not prohibit Davis for arguing for the application of any role adjustments pursuant to the Guidelines.  The Plea Agreement stated that a role adjustment per U.S.S.G. § 3B1.2 may reduce the defendant's sentence by 2, 3, or 4 levels and could result in an adjusted offense level range of 151 - 188 months for a 2 level reduction, 140 - 175 months for a 3 level reduction and 130 - 162 months for a 4 level reduction.[11]

The Plea Agreement stated that the parties had no agreement as to the defendant's criminal history category.  The Plea Agreement stated that the government estimated that it would be category III if she was not deemed a career offender pursuant to U.S.S.G. § 4B1.1 and if she were deemed a career offender, her criminal history would be category VI.  The defendant "understands that the court may find the defendant's criminal history to be higher than the United States has estimated."[12]

---

[11] Plea Agreement, pp. 17-18.

[12] Plea Agreement, p. 18.

Pursuant to the Plea Agreement the parties agreed that neither the United States nor the defendant would seek any upward or downward sentencing departures unless specifically set forth in the Plea Agreement.  In §5E the caption reading "Ultimate sentence left to discretion of the court" was highlighted in bold face.  This section stated: "The defendant fully understands that the Court has total discretion to determine the ultimate sentence and that the defendant will not be permitted to withdraw her plea or appeal her sentence if the Court deviates from the sentencing estimates or recommendations made by either the United States or defense counsel."[13]

The Plea Agreement set forth the elements of the offense and a factual basis for the plea.   Section IX addressed the defendant's agreement and understanding of the terms of the Plea Agreement.  It recited that the defendant wished to plead guilty to Count 2 of the Indictment and listed the rights she was giving up by so doing.  It also contained the following language: "I am fully satisfied with the representation given me by my attorney, Scott Sterling.  We have discussed all possible defenses to the charges in the Indictment.  My attorney has investigated my case and followed up on any information and issues I have with my attorney to my satisfaction and  my attorney has taken the time to fully explain the legal and factual issues involved in my case to my satisfaction.  We have discussed how my

---

[13] Plea Agreement, p.19.

sentence will be calculated under the United States Sentencing Commission Guidelines as well as the statutes applicable to my offense and other factor that will affect the sentence calculation in my case. We have also discussed the sentencing estimates prepared by the government contained in this agreement and I understand they not binding on any party."[14]  Further this section stated: "I understand that the discussions between me and my attorney concerning my sentence exposure or the actual sentence the Court  might imposed are only estimates and do not bind the Court.  I understand that the Court has the ultimate discretion to determine the sentence to be imposed in my case.  I understand the United States has not guaranteed me a motion for a substantial assistance departure and the Court is not bound to grant such a motion if the government files one.  Unless specifically set forth in this agreement, I understand that if the Court deviates from the sentencing recommendations made by either the United States or my attorney, I cannot withdraw my guilty plea or from this agreement, and that I am waiving my right to appeal the Court's sentencing decision."[15]

        The Plea Agreement recites that the document contains all agreements made between the parties and states "I have read this Plea Agreement carefully and

---

[14] Plea Agreement, p. 24.

[15] Plea Agreement, p.25.

understand it thoroughly."[16]  Immediately above the signature of Scott Sterling is a paragraph stating that as counsel for the defendant he has discussed with her the terms of the Plea Agreement and fully explain the charge to which she is pleading guilty and the necessary elements, all possible defenses, and the consequences of her plea.  It recites that he knows of no reason to question her competency to make these decisions and that prior to the imposition of sentence if he becomes aware of any reason to question the defendant's competency to enter into the Plea Agreement or to enter a plea of guilty he will immediately inform the court."[17]

## B.  Change of Plea Hearing

A hearing regarding Twila Davis' proposed change of plea took place on October 15, 2005 beginning shortly after 9:00 a.m.[18]  AUSA Goeke advised the court that Davis had just signed the Plea Agreement that morning.  Mr. Sterling agreed and added that he and his client had copies of the draft plea agreement and had reviewed changes that were made between the parties the previous day.  An oath was then administered to Ms. Davis and Judge Holland explained to her the significance of being placed under oath.

---

[16] Plea Agreement, p.26.

[17] Plea Agreement, p.27.

[18] A copy of the transcript of proceedings is filed at Docket No. 246.

The colloquy between the Judge and Ms. Davis elicited the fact that she had graduated from high school and reads and speaks the English language. She acknowledged that she had read the Indictment for her self and discussed it with her attorney. When asked if her attorney had answered any questions that she had about the charges she responded, "several." When asked if she was entirely satisfied with the representation that she was receiving from Mr. Sterling in this case she remarked "absolutely." The judge asked if she had read the entirety of the Plea Agreement herself and she responded, "yes, sir." She gave the same response when asked if she had discussed it with Mr. Sterling. The judge then asked if she had discussed the changes agreed to between her and her attorney and the government's attorney and she said that she had. Again the Court asked if Mr. Sterling had answered any questions that she had about the Plea Agreement and she said "yes, he did."

The judge asked Davis if anyone had made any promises to her about the disposition of her case that are not recorded in the written agreement. She answered 'No, sir." She was asked if she understood that the judge was not obliged to accept the recommendations that are included in the Plea Agreement; her answer was "yes, sir. I understand." She was then asked if she understood that the judge would make his own evaluation of the situation and make his own decision about sentencing in this case and she indicated yes.

The Judge informed Ms. Davis of the sentencing range for a violation of 21 U.S.C. § 841, namely that the person must serve a prison term of five years and may be in prison for up to forty years.  Again, the court repeated the statement that it would evaluate her Plea Agreement and decide what her sentence should be. The judge then asked Ms. Davis is she had discussed with Mr. Sterling how those sentencing guidelines are likely to affect her case.  She indicated that she had.  The judge pointed out that the Plea Agreement contained information about an estimate of what her sentence might be under the Guidelines.  He asked if she understood that he would make his own decision as to how the Guideline should apply in her case.  She indicated that she did so understand.  The Judge asked her if she understood that "I'm not required to follow the estimate that's in your Plea Agreement."  She responded, "yes, sir."

The judge pointed out the Plea Agreement contained a provision in substance saying that neither the defendant nor the government was going to ask for any kind of departure unless it was specifically provided for in the Plea Agreement.  Ms. Davis indicated she recalled that agreement.  When the judge asked whether she recalled that the Plea Agreement contained a provision which may result in the government requesting the judge to affect a departure in the case, Ms. Davis responded "I'm not quite sure I understand what you just asked me.  I'm sorry." The judge then explained about departures, and Ms. Davis indicated that she

understood.  She indicated to the judge in response to his question that she understood that the government was not obliged to ask the court for any departure. The court then posed a question that supposing that the government did ask for departure whether she understood that the judge would decide whether or not to grant the departure.  She indicated that she did understand that.  The judge followed up with a question that if he were to decide to deny a departure, under the Plea Agreement she would not be in a position to withdraw her plea.  To this and the question of whether she understood that the judge would make the final decision about how great the departure should be, she acknowledged her understanding. These questions were repeated by the Court and Mr. Sterling interposed that a provision of the Plea Agreement provided him an opportunity for seeking adjustments to the defendant's role that could result in a four level downward departure.  The government and the judge agreed that she was entitled to argue for an adjustment in the role of the offense.

        The court explained that the sentencing guidelines have base numbers that are considered to reflect the seriousness of the offense and that the base numbers have to do with the quantity of drugs.  The judge explained that she was not giving up her right to ask for appropriate adjustments but she was giving up her right to have the judge disregard the Guidelines.  Ms. Davis indicated that she was "following" the judge's explanation.  The judge then explained the advisory nature

of the Guidelines which are no longer mandatory.  He also explained the circumstances of the offense that he would consider in deciding the actual sentence. The judge told Ms. Davis she could still walk away from the Plea Agreement and receive a trial by jury on the two charges against her.

Judge Holland directed the defendant's attention to page 20 of the Plea Agreement reciting the factual statement.  Mr. Goeke offered to read the entire factual bases for the modified Plea Agreement and the judge asked Ms. Davis to listen to what the prosecutor was going to say and when he finished he was going to ask her if what he had read was true and correct.  Ms. Davis acknowledged her understanding and after the factual statement was read pointed out that the post office involved was Ward Cove, not Ketchikan.  With that clarification she agreed that the statement read was true and correct.

To the charge made in Count 2 of attempted possession of controlled substances, "and in particular 50 grams of methamphetamine," the judge asked Ms. Davis how she pled at that time.  Davis stated "I'm guilty."

Mr. Goeke advised the court that Ms. Davis had cooperated when she was first contacted by law enforcement and that the government intended to invoke the cooperation provision of the agreement and move for a substantial assistance departure.

### C.  Sentencing Hearing

An evidentiary hearing on the imposition of sentence occurred on February 9, 2006 before Judge Holland.  At this hearing it was agreed between the parties that Ms. Davis had two prior felony convictions applicable to the extent that they would qualify her as a career offender under the advisory guidelines.  Also, Mr. Sterling indicated that the parties had agreed that the applicable quantity of drugs for purposes of calculating her offense level was 76.2 grams, "and not the larger quantities that were involved in the larger conspiracy operation."[19]  Mr. Sterling stated that the parties had left open for argument how far the court should go on the substantial assistance credit.  Mr. Sterling acknowledged that he had discussed the Pre-sentence report with Ms. Davis, and the defendant acknowledged the same when asked by the Judge.

Judge Holland commented on the Pre-sentence report which found no appropriate adjustments to the base offense level.  The judge indicated that he had taken a hard look at the defendant's role in the case but for purposes of Guideline calculation the role in the offense issue was simply moot because of the concession which he concurred in regarding the fact that Ms. Davis had two prior felony criminal convictions.  The Judge pointed out that under the guideline, the record made her a career offender which affected the offense level by increasing it to 34.

---

[19] Transcript of Imposition of Sentence, Docket No. 247, p.3.

The Pre-sentence report found the defendant entitled to the three point acceptance of responsibility which brought the total offense level to 31. The attorneys for the parties agreed with this assessment. The Court addressed the government's motion for a departure for substantial assistance, asking Mr. Goeke to summarize the nature and extent and substance of the government's position on substantial assistance. Mr. Goeke indicated that the government had no reason to believe that she had been anything but truthful with the government and that she had been co-operative. Her cooperation led to Mr. Roseberry's ultimate arrest in the case. The judge asked the prosecutor to place Ms. Davis' cooperation in context with that of other defendants in the case who had also agreed to cooperate. Mr. Sterling was given the opportunity to add his view of the defendant's cooperation for purposes of sentencing. He asked the court to depart one level under the discretionary guidelines to balance the sentence with that given other defendants based on her culpability.

The judge announced that he was persuaded that a two level departure was a bit light and was inclined to go for a four level departure under 5K1.1. The result would be to reduce the total offense level to 27. The application of the career offense guideline had the affect of increasing the criminal history category to 6.

Mr. Sterling argued that the criminal history category was over stated by 6 and that the court should invoke the provision of Guideline § 4A1.3(b)(3). Mr.

Sterling asked for a one level horizontal departure from 6 to 5.  The court agreed to a one level criminal conduct departure and indicated that at offense level 27 with a criminal history of 5 the Guideline suggested 120 to 150 months for incarceration.

The court considered the non-guideline factors and the fact that no role in the offense adjustment was possible under the Guideline because of the career offender status.  Counsel for each party was heard regarding any non-guideline matter and Mr. Goeke argued that the defendant should be held accountable for 72 grams of methamphetamine, the amount contained in the package rather than the larger amount that was involved in the conspiracy.

The government was satisfied with Davis receiving the reduction and the criminal history score by giving her additional points for acceptance of responsibility as well as for her cooperation and that the court's independent assessment that the guideline range was an appropriate sentence.  In the government's view it was not necessary to go outside the guidelines based on any § 3553 factors particularly because this was her third drug dealing offense.

Mr. Sterling argued for the defendant's eligibility for placement in the Akeila House and for the court to balance and weigh her culpability relative to the co-defendants in accessing a role adjustment.  Based on the judge's comments Mr. Sterling recognized that a 5-year sentence was out of the offering and argued for a 7-year sentence as an appropriate balance in relation to the other sentences

imposed.  Mr. Sterling summarized letters received from family and friends of the defendant.

Mr. Goeke argued that a big difference between the co-defendants and Ms. Davis was her criminal history.  He added that going below the guideline range would ignore her prior criminal history.  He noted that Ms. Davis had had several opportunities in the past for treatment and that given her age one would expect that this type of activity would be behind her.

Ms. Davis was given the opportunity for allocation.  She read a prepared statement to the court.  Before imposing judgment the judge stated that the final matter was whether or not there were any non-guideline matters which he should take into consideration.  In the judge's opinion, Ms. Davis was a defendant who was seriously addicted and who was likely to experience great difficulty in overcoming methamphetamine addiction.  This suggested to him the need for a longer sentence. The judge stated that he was unable to turn a blind eye to the fact that Ms. Davis was not only using drugs but was dealing and passing drugs to other people who were addicted.  The judge was satisfied that the non-guideline factors of § 3553 had been adequately dealt with by the Guidelines and the court's application of them in the instant case.  Judgment was then imposed upon Ms. Davis.

### D.  Evidentiary Hearing on Motion to Vacate

On November 13, 2007 an evidentiary hearing on the motion to vacate under § 2255 was conducted by a magistrate judge. *See* Transcript at Docket No. 338. Twila Jo Davis represented by Meredith Ahearn testified on her own behalf. The government called Scott Sterling as a witness. From this hearing the magistrate judge makes findings of fact as follows:

Scott Sterling a member of the Criminal Justice Act Panel of the U.S. District Court was appointed to represent Twila Jo Davis. Mr. Sterling traveled to visit Davis at the Lemon Creek Correctional Center in Juneau where Davis was incarcerated. He discussed with her the charges, the matter of bail and the choice of going to trial or entering into a plea agreement. Ms. Davis had lots of questions which Sterling answered. After her arrest, Davis had been cooperative with the law enforcement. At some point she was moved to Anchorage, Alaska, still in custody.

Mr. Sterling has been a licensed attorney in Alaska since 1987. He has served primarily as a criminal defense attorney and opened his own law office in 1996 in Wasilla. In 1999 he took in a partner in his law practice. Since July 2007 Mr. Sterling has worked for the State of Alaska, Office of Public Advocacy in Anchorage traveling the state and handling unclassified and Class A felony matters for indigent defendants primarily in bush communities in Southeast Alaska. He estimated that he has represented hundreds of individuals on felony charges

including frequent appearances in federal court in felony cases as a member of the CJA Panel.

Twila Jo Davis was charged in a two-count indictment emanating out of Ketchikan, Alaska.   Count 1 charged her with a conspiracy to commit drug offenses and Count 2 charged her with attempted possession of contraband.  Four co-defendants in her case were all charged in the same conspiracy count.  The pretrial services report reflected that Ms. Davis has two prior drug felonies.  Mr. Sterling knew that pursuant to federal statute, the government could allege the existence of those two priors for purposes of enhancing any sentence.  Under the conspiracy statute 21 U.S.C. § 851 the two prior felonies could result in her receiving a sentence between five years and life imprisonment.  In early negotiations, the government advised Mr. Sterling that if the defendant were to proceed to trial the prosecutor would file an enhancement notice alleging existence of the two prior felonies thus exposing Davis to a mandatory life sentence if convicted of the conspiracy count.

Mr. Sterling learned that other co-defendants were entering into plea agreements with the government.  This indicated to him that one or more of those defendants may be cooperating with the government to provide testimony against Ms. Davis if she went to trial.  Mr. Sterling had numerous conversations with Ms.

Davis, mostly by telephone. Ms. Davis vacillated between wanting to go to trial and entering into a plea agreement.

The mandatory minimum sentence for Count 1 conspiracy, would have been ten years. On Count 2 the mandatory minimum was five years. Mr. Sterling interviewed potential witnesses to assess the relative strength of the government's evidence. He concluded that the government's case was fairly strong. Therefore he decided that the best strategy was to limit Davis' exposure to the least amount of time possible.

Ms. Davis agreed to be debriefed and that lasted almost a full day. Mr. Sterling felt there were some compelling aspects to Davis' personal situation in her life that could work to her favor in getting a lower sentence. After negotiations, the government presented Sterling with a draft plea agreement.

The draft agreement provided that there would be a Guideline Analysis conducted. An estimate in the draft plea agreement indicated the statutorily required minimum of 5 years for count 2. Mr. Sterling discussed the draft plea agreement and the possibility of an enhancement for being a career offender with Ms. Davis. The draft plea agreement contained warnings that Ms. Davis could be considered a career offender and that the sentencing judge might depart and sentence her to something that was not contemplated by the plea agreement or the court could reject the plea agreement entirely.

In Mr. Sterling's assessment, Ms. Davis is an intelligent and articulate person. She had many questions and comments on the draft plea agreement. Mr. Sterling candidly tried to hold out hope for her that he could get a five-year sentence; however, he told her that it was not guaranteed or promised but something worth fighting for. He told her it would be difficult because of her two prior drug convictions. Based on the comments by Mr. Sterling and the parties' discussions, a final plea agreement was prepared by the U.S. Attorney's office and transmitted to Mr. Sterling. There is no substantial difference between the final agreement and the draft agreement in the terms of Ms. Davis' sentencing exposure. There were differences in terms of accounting for substantial assistance and her role in the offense. Mr. Sterling went over the final agreement with Ms. Davis.

Mr. Sterling well understood that the final plea agreement did not guarantee that she would receive a sentence of five years. It did preserve the defendant's right to argue for application of 18 U.S.C. § 3553 factors. The agreement referenced the Advisory Guidelines sentence which was actually higher than ten years. The agreement included the provision for substantial assistance if the government deemed Davis' cooperation to be material and beneficial to the government. Mr. Sterling was able to obtain a commitment by the prosecutor that the government considered Davis' cooperation to be of substantial assistance.

Throughout all of the pretrial negotiations, Mr. Sterling advocated for his client on a professional and competent level.

In a letter dated October 22, 2005, addressed to Jim Goeke, Assistant U.S. Attorney, Mr. Sterling alluded to the discussion of the draft plea agreement and was still attempting to get the government to agree to five years.[20] The letter expressed Ms. Davis' objection to the factual basis statement on pages 20-21 of the draft plea agreement.  The government would not agree to a sentence of five years or a binding plea agreement under Federal Criminal Rule 11(c)(1)(C). Three days later sentencing occurred.

Mr. Sterling was aware of the need not to mislead his client but he still considered it legally possible to argue for five years under the Plea Agreement.  At sentencing there was a lot of discussion about the nature and the scope of the departure that Ms. Davis should receive for substantial assistance.  The government recommended that she receive a two level decrease for substantial assistance and the defense argued for more.  Judge Holland decided to give Ms. Davis a four level decrease.

At sentencing Mr. Sterling made several arguments about the § 3553 factors on Ms. Davis' behalf.  He talked about her cooperation with the government and the nature of her addiction and potential for rehabilitation.  Although the

---

[20] Defendant's Exhibit C.

sentencing judge did not give as much weight to the § 3553 factors as defense counsel had sought, the ultimate sentence imposed was significantly lower than what the government had sought.  The court reduced Ms. Davis' category by one level ruling that it was overstated because of the existence of the two prior felonies.  The two prior felonies automatically constituted a career offender status.

When Davis was placed at Highland Mountain Correctional Center in Anchorage her attorney visited her there.  In Sterling's assessment, Davis asked good questions at their meetings and she wrote her attorney and frequently called him.  Ms. Davis frequently asked questions about the process and the plea agreement, as well as all aspects of her case.

Sterling felt that since the guidelines were advisory under Booker, the designation as a career offender would become a term of description rather than a legally binding definition.  He considered it significant that the plea of guilty was avoiding the potential for a life sentence for Ms. Davis.

Mr. Sterling knew that if the case went to trial it would be important to have an evidentiary hearing on a number of issues including the quantity and quality of drugs at issue.  If that choice had been made, he would have more closely examined the government's handling of the evidence and lab procedures, as well as the chain of custody for the methamphetamine.  Once the decision was made to

enter into a plea agreement the challenge to the quantity of drugs became moot.

The quantity of drugs was not a determinating factor in this sentence.

Ms. Davis signed the Plea Agreement filed with the court on the

morning of the change of plea hearing.[21]  Ms. Davis testified that when she signed

the Plea Agreement she understood that her sentence would be or could be

potentially five years.  Her reason for believing this was her full cooperation with the

government.

The draft plea agreement was never signed by the parties.  Ms. Davis

claims that she did not take the time to read the final plea agreement before signing

it in the courtroom because she assumed that she was being adequately protected

by her attorney and she had discussed the draft agreement fully with him.  Ms. Davis

claims that she was not aware that the career offender status would be used against

her although she was aware that she could be considered a career offender.

Ms. Davis received a copy of the letter addressed by Jim Goeke to Scott

Sterling dated September 23, 2005.  The letter contains a statement that if she

proceeds to trial the United States would immediately file a notice of her prior drug

felony convictions pursuant to 21 U.S.C. § 851.  Because this statement does not

appear in the Plea Agreement, she states she assumed that in the absence of the

---

[21] At the Evidentiary Hearing Ms. Davis erroneously stated that she signed
the Plea Agreement the same morning that she was sentenced.  Tr. 7.

government filing such a notice her prior drug felony convictions would not play a part in her sentencing. This view is highly unrealistic and reads into the letter a position or commitment that was not so stated. The letter was written during the pretrial negotiations before a plea agreement was drafted. Literally, the letter simply states that the government would file a formal notice of the prior drug felony convictions pursuant to 21 U.S.C. § 851 if she chose to go to trial. The effect of such notice would expose her to a mandatory 10-year sentence and the possibility of life. The letter says nothing about the government's position regarding her criminal record if the parties negotiated a plea agreement.

Ms. Davis testified at the evidentiary hearing that by accepting a plea agreement she believed she was protecting herself from the career criminal status. In effect, she was protecting herself from the sentencing exposure for the conspiracy charge not her status as a career criminal. Ms. Davis claims that the language in the September 23, 2005, letter meant to her that if she proceeded to trial "they would make me a career criminal." Her criminal history designated her "a career criminal," not the government's position on plea bargaining. The court was made aware of the prior drug felony convictions in the pretrial services report. Criminal history is a significant factor always considered at sentencing.

Ms. Davis claims that under the plea agreement she believed that she would receive a mandatory minimum sentence of five years. Although the plea

agreement sets forth the mandatory minimum of five years for Count 2, nowhere in the agreement does it promise or guarantee that the government would argue for such a sentence, or the court would impose such a sentence.

Ms. Davis claims that she did not discuss her potential sentence of ten years with Mr. Sterling. Her position is contradicted by the language of the Plea Agreement which she signed. Rather than receive ineffective assistance of counsel, Ms. Davis relied on her own misunderstanding without informing her attorney or the court if she indeed had such confusion over the sentencing range she was exposed to.

The Plea Agreement did not provide for a binding agreed sentence by the government and clearly left discretion to the court to decide what sentence to impose. The evidence suggests that Ms. Davis is an articulate, intelligent person who likely understood her imprisonment exposure prior to sentencing. Her testimony that she believed she would receive a mandatory minimum sentence of five years is contradicted by the record and the testimony of Scott Sterling. There is no factual basis to support her assumption that she would be "protected" from her career criminal status. Mr. Sterling informed her that he would advocate for a five-year sentence if that was possible. Ms. Davis' testimony that receiving a ten-year sentence was a "total shock" is contradicted by the plea agreement and her colloquy with the court at the change of plea hearing. Ms. Davis testified that she understood

that the judge would take into consideration the statements of both parties.  She had

no reason to believe that the government would "protect" her from getting ten years.

The origination of such thought certainly did not come from her attorney Scott

Sterling who is alleged to have rendered ineffective assistance of counsel.

Ms. Davis testified at the evidentiary hearing that her reason for asking

for an evidentiary hearing on the issue of quantity and quality of the package (sic)

was so that the evidence could "knock" her below the five-year range.  She was

clearly advised that there was a mandatory minimum sentence of five years for

Count 2 putting aside the criminal career status.  The quantities of drugs were

different for her co-defendants who were also charged with conspiracy.  Ms. Davis

acknowledges discussing the desirability of a private test of the drug quality and

quantity with Mr. Sterling.  She claims not to known why no private drug testing was

undertaken.  The basis for her request for an evidentiary hearing was her information

that the co-defendants quantity was different than hers. She testified at the

evidentiary hearing that she had no idea what quantity of drugs was in the package.

Yet, she was present at sentencing when Mr. Sterling and the government stipulated

to the testing and the quantity of the drugs. She said nothing about this to her

attorney or to the court.

Ms. Davis claims to have been angry when she received the ten-year

sentence and felt betrayed.  The basis for these feelings was the fact that she had

been cooperative with the government and thought she received nothing in return. However, the government agreed to drop the conspiracy count allowing her to avoid exposure to the life sentence and the government clearly informed the court that she had been cooperative.   The defendant provides no basis under the advisory sentencing guidelines or otherwise as to what more she should have received because of her cooperation with the law enforcement officers.

Ms. Davis' claim that she signed a five-year plea agreement is not borne out by the facts.  There is no evidence of such an agreement.  She acknowledges that at the sentencing hearing, she heard the government argue for more than five years.  She acknowledges that Mr. Sterling told her that the judge could sentence her to the prosecutor's recommendation.   Yet, she chose not to indicate her misunderstanding or displeasure with the recommendations before sentence was imposed.  The judge asked specific questions that should have elicited her response to bring to light such an issue if she had any reluctance going forward with her plea of guilty to Count 2.  Her argument that she chose not to ask any questions of the court although she did not understand "a whole lot of what [the judge] was saying . . ." because he was talking fast is not convincing.  Her decision to plead guilty occurred after discussions with her attorney, reviewing a draft plea agreement, signing the plea agreement and pleading guilty in court and then weeks later going forward with sentencing.

Ms. Davis acknowledges that she recognized that she had two prior state drug felonies. She acknowledges understanding that she could have faced a mandatory life sentence if she proceeded to trial and that her attorney explained that to her. In her discussions with Mr. Sterling, she bought a number of corrections to his attention regarding the plea agreement. These were largely factual issues but it is evidenced that she participated in and understood the content of the plea agreement. She also brought a factual correction to the attention of the court at the change of plea hearing. The government lived up to its part of the bargain about acknowledging her substantial assistance and their recommendation to the court.

Nothing stated in the plea agreement supports Davis' statement that she thought she was protected from any adjustments to the base offense level that would render her sentence greater than 5 years. Having told the Judge at the change of plea hearing that she had an opportunity to read the plea agreement, her argument that it should have been obvious that she had not had a chance to re-read the plea agreement is without merit. The judge is not expected to be a mind reader when the defendant responds that she has read the plea agreement but thinks something else to herself. At that hearing, Ms. Davis made no distinction between the draft plea agreement and the signed plea agreement. Based on the record, there was no difference in her sentencing exposure from the draft plea agreement

to the final plea agreement.  When asked about that difference Ms. Davis stated at the evidentiary hearing that she did not know of any.

Ms. Davis testified at the evidentiary hearing that she was satisfied that her attorney would have answered any questions she asked of him.  When asked at the evidentiary hearing if she understood the meaning of the question whether anyone had made any promises to her about the disposition of her case she indicated that she did not.  That response is not credible.  When it was pointed out to her that the plea agreement did not state anywhere that she was going to receive a sentence of five years she then stated that she was "led to believe" that because of her full cooperation with the government she would receive a five-year sentence. The defendant has offered no credible evidence upon which to base such a belief. Mr. Sterling's October 22, 2005 letter advocating the U.S. Attorney to concur in the defendant's request for a five-year sentence is evidence itself that the draft plea agreement did not contain a promise of five years.

Ms. Davis testified that she received a letter that said that the career criminal status would not be an issue at sentencing.  The letter in evidence did not say that, rather it stated that if she went to trial the government intended to rely upon the career criminal status if she were convicted.  The letter did not address what the government might or might not do if the defendant pled guilty pursuant to the plea agreement.  The defendant acknowledges that she had two prior drug convictions.

Yet, she testified she did not have multiple convictions. The defendant appears to engage in word games.

The sentencing judge declined to ignore the career offender status regardless of the arguments by counsel. The ten-year sentence was not imposed as a result of the government's violating any plea agreement with the defendant. Ms. Davis' recollection of the government arguing for seven years is erroneous in light of the transcript of the sentencing hearing. It was her attorney who argued for seven years in an effort to obtain some sentence less than ten years based on the statements of Judge Holland before sentence was actually imposed.

At the evidentiary hearing, Ms. Davis claimed not to recall addressing the court directly in allocution. At sentencing, she did not dispute any of the sentencing discussions before the court. She claims that she did not tell the court that she thought she was going to get five years or indicate to the court that she did not understand what was going on because she "didn't know that I needed to." That position is contradicted by her responses to the court's questions, as well as common sense. She told Judge Holland she did not understand his question when he discussed departures under the Guidelines. *See*, p.11, *infra*. Apparently Ms. Davis has latched onto her attorney's statements that he would try to get her a five-year sentence and elevated it to an understanding on her part that she would receive five years.

Davis offers the explanation that she didn't tell anyone that she had concerns at sentencing about the duration of the sentence because she "couldn't keep track of the numbers." Yet, the numbers were contained in the plea agreement including the draft agreement as well as the Pre-sentence report. Her claim that she thought all of the objections and conflicts would have been "straightened out" prior to sentencing is contradicted by Mr. Sterling's testimony that he discussed with her the efforts he was going to make on her behalf.

The defendant has made no showing that the facts and issues addressed by the court at sentencing were decided wrongly. Ms. Davis testified that she did not discuss with Mr. Sterling any concerns about the duration of her sentence between the change of plea hearing and sentencing hearing. This suggests that she had no questions for her attorney. Ms. Davis admitted that Mr. Sterling never told her that she was going to get a five-year sentence. Her belief that the prosecutor would recommend five years is unfounded. Her sentence of ten years was the result of the judge's determination of what the sentence should be and was not dependent upon the government's reliance upon her career offender status.

### E.  Standard for Ineffective Assistance of Counsel Claims

Ineffective assistance violates the Sixth Amendment right to the assistance of counsel. Claims are subject to analysis under the two-prong test established in <u>Strickland v. Washington</u>, 466 U.S. 688 (1984). The <u>Strickland</u>

analysis requires that the criminal defendant show not only that his attorney's representation was deficient, but also that the attorney's representation prejudiced his cause. *Id.* at 693. The defendant bears the burden of demonstrating that his attorney's performance was "so deficient that it fell below an objective standard of reasonableness." Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002).

"Judicial scrutiny of a counsel's performance must be highly deferential," and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel' perspective at the time." Strickland, 466 U.S. at 689. A defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*; *see also*, Murtishaw v. Woodford, 255 F.3d 926, 939 (9th Cir. 2001) (defendant "bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.").

To establish prejudice the defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland, at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* "It is not enough for [a defendant] to show that the errors had some conceivable effect on the outcome of the proceedings. Virtually every act or omission of counsel would meet

that test, and not every error that conceivable could have influenced the outcome undermines the reliability of the result of the proceedings." *Id.* at 693.

A court need not determine whether counsel's performance was deficient before examining the prejudice suggested by the defendant as a result of the alleged deficiencies. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness of counsel claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." Strickland, at 697.

The outcome of this motion is highly fact dependant. Applying the Strickland analysis, Davis has not shown that her trial attorney's representation was deficient or that his representation prejudiced her cause. Davis has not overcome the presumption that her counsel's conduct fell within the wide range of professional assistance. She has not demonstrated that there is a reasonable probability that but for her counsel's (alleged) unprofessional errors, the result of her sentencing would have been different.

### F. Conclusion

For the reasons stated above, Ms. Davis has not demonstrated that her attorney rendered ineffective assistance of counsel, or that she is entitled to have

her sentence vacated.  The motion to vacate lacks merit and should therefore be denied.  IT IS SO RECOMMENDED.

DATED this ___Third___ day of January, 2008, at Anchorage, Alaska.


___/s/ John D. Roberts_____
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than NOON, **January 16, 2008**. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. <u>McCall v. Andrus</u>, 628 F.2d 1185, 1187-1189 (9th Cir.), <u>cert</u>. <u>denied</u>, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation <u>United States v. Howell</u>, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before January 24, 2008.  The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).